**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

AUNTRA LAMAR,

                Plaintiff,

-vs-                                        Case No. 3:13-cv-1101-J-34JBT

PILGRIM'S PRIDE CORPORATION,

                Defendant.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment and Memorandum of Law (Doc. No. 28; Motion) filed on January 12, 2015.  Plaintiff opposes the Motion.  See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 32; Response); Plaintiff's Notice of Filing Documents in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 38).  With the Court's leave, see Order (Doc. No. 48), Defendant filed a reply to Plaintiff's Response on April 8, 2015.  See Reply in Support of Defendant's Motion for Summary Judgment (Doc. No. 49; Reply).  Accordingly, this matter is ripe for review.

## I.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[1] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the

---

[1]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.   Background

Plaintiff Auntra Lamar (Lamar or Plaintiff) initiated the instant action against Defendant Pilgrim's Pride Corporation (Pilgrim or Defendant) on September 10, 2013, by filing his Complaint (Doc. No. 1). In the Complaint, Lamar alleges that Pilgrim interfered with his ability to take leave or retaliated against him for taking leave in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA). See generally id. Specifically, Lamar alleges that he "was terminated from employment with Defendant due to excessive attendance issues, despite that Plaintiff had provided medical documentation and sought leave for absences related to his child's medical care and serious medical condition." Complaint ¶12. Accordingly, Lamar alleges that he "was denied rights and benefits conferred by the FMLA and was terminated after requesting and/or seeking leave." Id. ¶17.

Lamar worked for Pilgrim at the Live Oak facility as a chicken deboner from some time in July of 2011, until his termination on May 14, 2013. See Deposition of Auntra Lamar (Doc. Nos. 28-2 & 28-3; Lamar Dep.) at 24-26, 37, 79, 103. Upon hiring, Pilgrim required Lamar to complete training classes on various subjects including Pilgrim's attendance policy.

See id. at 26-27; see also Exhibit 2 to Lamar Dep., Partner Training Record/Receipt of Employee Handbook (Training Record).  Pilgrim's attendance policy operates on a point system pursuant to which an employee receives one point for an absence or working less than four hours in a day, and one-half point per workday for tardiness or leaving before the end of a shift.  See Exhibit 3 to Lamar Dep. (Pilgrim Employee Handbook) at 14; Lamar Dep. at 28-29; Deposition of Cynthia Cason (Doc. No. 28-4; Cason Dep.) at 7-8, 21; Deposition of Debra Aikens (Doc. No. 28-5; Aikens Dep.) at 18-19.  Pilgrim provides only a one minute grace period such that if an employee clocks in more than one minute after the start of his or her shift, that employee is tardy.  See Aikens Dep. at 16.  An employee against whom Pilgrim assesses a point can "work off" or remove that point by working as scheduled for thirty consecutive, non-inclusive workdays.  See Pilgrim Employee Handbook at 14; see also Cason Dep. at 9.

In accordance with Pilgrim's attendance policy an employee will receive written warnings at six and nine point intervals, and if that employee reaches twelve points, he or she will be subject to termination.  Pilgrim Employee Handbook at 14; Lamar Dep. at 36. The nine-point warning is the final written warning "to emphasize the need of improving his or her attendance."  Pilgrim Employee Handbook at 14; see also Cason Dep. at 9.  With respect to terminations, the attendance policy states that "[t]he supervisor will provide a copy of the attendance log sheet to the Processing Plant Manager for preparation of written disciplinary discharge action," a copy of which the supervisor provides to the Union.  Id. at 14-15.  The attendance policy further provides:

An employee failing to report to work as scheduled shall be required to provide acceptable proof when requested to do so, an[d], if unable to do so, shall be charged with an absence.  An employee will be given five (5) days to provide proof.  Absences substantiated by documentation and defined elsewhere in this agreement for funeral pay, jury duty, union leave, paid job injury, FMLA qualifying need (provided the employee notifies the company of FMLA need prior to the absence) and court summons are not considered absences for the purposes of this procedure.  Employees are responsible for notifying the employer if they will be absent from work or unable to be at work by their scheduled starting time.  The employer will provide employees a written call-in/notification procedure applicable to the department in which they work.  Employees shall notify their supervisor of upcoming, prescheduled or appointment type absences prior to the absence if at all possible.

Id. at 15.

During his employment with Pilgrim, Lamar worked the second of three shifts, which started at 4:40 p.m., on Monday through Friday, as well some Saturdays.  See Lamar Dep. at 37; Aikens Dep. at 15-16.   Approximately 633 line workers of Pilgrim's 1565 total employees worked the second shift.  See Declaration of Dave Butters (Doc. No. 28-1; Butters Decl.) ¶¶4-5.  Assigned to the deboning department, Lamar was required to clock in at a time clock which often had long lines.  See Lamar Dep. at 51.

On February 19, 2013, Lamar's supervisor, Debra Aikens, issued Lamar a documented verbal warning for having accumulated six points under the attendance policy. See Exhibit 6 to Lamar Dep., Progressive Discipline Form (6-Point Warning);[2] Aikens Dep.

---

[2]     The 6-Point Warning covered five absences: December 17, 2012, December 28, 2012, January 15, 2013, February 4, 2013, February 8, 2013, and three tardies: January 17, 2013, January 25, 2013, and February 6, 2013.  Lamar's testimony regarding whether he believes these points were accurate is somewhat vague and contradictory. However, he fails to identify any specific date for which Pilgrim erroneously assessed points beyond a general assertion that he was in line to clock in for all the times he was marked tardy.  See Lamar Dep. at 46-49 ("But as far as these tardies, you know, I was - - I was completely at work on time.  But by me - - like I say, by me being in line to clock in behind other people, that's where them tardies come from.").  Moreover, Lamar signed the 6-Point Warning at the time he received it and did not note any objections to the points assessed.  See id. at 48-49, 52-53; 6-Point
(continued...)

at 19; see also Cason Dep. at 21; Lamar Dep. at 39, 44-46, 48. Lamar received and signed the 6-Point Warning on February 21, 2013.  The following month, on March 4, 2013, Aikens issued a final written warning to Lamar for having accumulated nine points.  See Exhibit 7 to Lamar Dep., Progressive Discipline Form (9-Point Warning);[3] Cason Dep. at 21; Aikens Dep. at 19 (stating that, at that meeting, Aikens "told him his points was getting up there, he needed to be on time to work, and he needed to come to work").  Lamar received and signed for the written 9-Point Warning on March 8, 2013.  Later in March, Lamar took personal leave following a death in the family and to care for his daughter, from March 20 to March 26, 2013.  See Lamar Dep. at 62-64; Exhibit 8 to Lamar Dep., Request for Leave of Absence.  He did not receive any points for absences during this period.  See Lamar Dep. at 66.

In mid-April, Lamar's daughter was badly burned.  She was treated for her injuries at Shands Hospital in Gainesville, Florida, from April 12 to April 15 or 16, 2013.  See Exhibit 11 to Lamar Dep., Certification of Health Care Provider for Family Member's Serious Health Condition (FMLA Certification); Exhibit 12 to Lamar Dep. (Work Excuse);[4] Lamar Dep. at 70-

---

[2](...continued)
Warning.

[3]    The 9-Point Warning includes additional absences on February 18, 2013, February 22, 2013, and March 1, 2013, and reflects two additional tardies on February 21, 2013, and February 25, 2013.  However, Lamar submits his time sheets for December of 2012 through the end of his employment in May of 2013, which reflect that Lamar was not scheduled to work on March 1, 2013.  See Time Statement List (Doc. No. 38-1; Time Sheets) at 14.  Although Pilgrim argues that neither Lamar nor his union steward objected to the point assessment for March 1, 2013, see Reply at 5, for summary judgment purposes, the Court assumes that Lamar was not absent.  Nevertheless because this point was assessed before Lamar ever requested FMLA leave, it does little to assist his claim.

[4]    The Work Excuse conflicts with the FMLA Certification in that it states that "[i]t was/is necessary for [Auntra Lamar] to remain at home/in the hospital with a sick child from 04/12/13 until
(continued...)

71.   Lamar was at work on April 12, 2013, a Friday, when he learned of his daughter's condition.  See Lamar Dep. at 96; Cason Dep. at 16-17, 19-20.  With the permission of his immediate supervisor, Debra Aikens, Lamar left early after being told that he would need to bring in documentation stating his daughter's name and that he was with her.  See Lamar Dep. at 96; Time Sheets at 20; Aikens Dep. at 8-9; Cason Dep. at 17.

Upon returning to work on April 16, 2013, Lamar provided documentation for his daughter's doctor's appointments.  See Lamar Dep. at 71-72, 96-97.  He also submitted a request for a personal leave of absence for those days his daughter was in the hospital from April 12, 2013, until April 16, 2013.  See Exhibit 12 to Lamar Dep., Request for Leave of Absence (Doc. No. 28-3 at 29).  Aikens approved the request.  See id.  Lamar explained that, after his daughter's initial injury, he had to take her back and forth to the doctor and was continuously bringing documentation from those visits to Pilgrim.  See Lamar Dep. at 71.  Lamar testified that "it had gotten to the point where I was bringing back so many documents from me going to the doctor with her, they just told me to go ahead and fill out an FMLA.  If anything happened, this FMLA would cover everything."  Id.; see also id. at 121-124 ("They told me, you know, as far as with my daughter or anytime I had to leave for, you know, any kind of - - like, you know, to actually see a doctor, they told me that that was - - it would cover for everything, you know.").  Therefore, several days later, Lamar obtained

_____

[4](...continued)
04/16/13," while the FMLA Certification reflects that Lamar's daughter was released from the hospital on April 15, 2013.  Regardless, Lamar's Time Sheets reflect that he worked on April 16, 2013.  See Time Sheets at 21.  Therefore, even if he could have taken leave through April 16, 2013, Lamar chose not to do so, and the exact date of the hospital discharge is not material to the resolution of the Motion.

a Request for Family, Medical or Military Leave (Doc. No. 28-3 at 35; FMLA Request) which

he completed and signed on April 19, 2013.

Included with the FMLA Request form was additional paperwork.  <u>See</u> Deposition of

Princess Williams (Doc. No. 28-6; Williams Dep.) at 11-12, 26-27; <u>see also</u> Exhibit 12 to

Lamar Dep., Checklist for Request for Family and Medical Leave Forms (Doc. No. 28-3 at

30-34; FMLA Paperwork).  The FMLA Paperwork explains:

> If you have an active Family Medical Leave of Absence (FMLA)
> paperwork on file with Pilgrim's Pride, please remember that you will need to
> turn in a doctor's note for every time you are absent, arrive late, or leave early
> because of the medical condition set up for you or your family member.  The
> doctor notes that you turn in to verify your absence for yourself, spouse,
> children, or parents must be signed by the doctor who signed and completed
> the original FMLA Certification of Health form.  Should you or your family
> member see another doctor(s) on a regular basis, then you will need for that
> doctor(s) to complete a Certification of Health form also.
> . . .
> FMLA leaves are only good for the specified time the doctor states or
> for one year for an ongoing condition.

FMLA Paperwork at 3.[5]  Either his daughter's treating physician or another doctor at the

hospital filled out the FMLA Certification.  <u>See</u> Lamar Dep. at 73-74.  The FMLA Certification

reflects that Lamar's daughter also had a follow-up appointment on May 2, 2013, and that

at that time her burn(s) had healed and she would not require future care.  <u>See</u> FMLA

Certification at 2-4; <u>see also</u> Work Excuse.  Lamar did not fill out the dates section of the

FMLA Request form, which would have indicated his expected return date.  <u>See</u> Williams

---

[5]      Lamar testified that he did not read the FMLA Paperwork because "the lady" scanned
through the content with him.  <u>See</u> FMLA Paperwork; Lamar Dep. at 122-27.  Regardless, there is no
dispute that the FMLA Paperwork contained the above language.  Moreover, Lamar was aware of the
need for paperwork because he testified that he had to request FMLA leave multiple times: "I had to go
through a whole lot just to get approval.  I had to actually bring back documentation from the doctor to
get approval."  Lamar Dep. at 95.

Dep. at 13; FMLA Request.  Nevertheless, after Lamar returned the paperwork to Princess

Williams, the Human Resources (HR) coordinator for Pilgrim responsible for FMLA leave,

Williams approved the request for the specific days the doctor indicated in the FMLA

Certification.  See id. at 6, 12-13, 20.

    Lamar testified that although he could have remained on FMLA leave throughout

April, he returned to work on April 16, 2013, due to financial concerns.  See Lamar Dep. at

81; Time Sheets at 21.  As such, the parties agree that Lamar was on approved FMLA leave

from the afternoon of April 12, 2013, through April 15, 2013, and on May 2, 2013.  See

Lamar Dep. at 74-78.  The dates following May 2nd, however, are disputed.

    After Lamar took his daughter to her appointment on May 2, 2013, he was scheduled

to work on May 6, 2013, but was absent.  See Time Sheets at 24; Lamar Dep. at 84-86.  On

May 9, 2013, Lamar left before the end of his shift and did not work the minimum number

of hours.  See Time Sheets at 24.  On May 10, 2013, although Pilgrim documented that

Lamar was tardy, he actually clocked in four minutes before the start of his shift.  See id.;

Exhibit 9 to Lamar Dep., Progressive Discipline Form (12-Point Termination); Time Sheets

at 24.  Thereafter, Lamar missed work on May 13, 2013,[6] and Pilgrim terminated his

---

[6]     The 12-Point Termination reflects that Lamar was absent on May 14, 2013, the day he
was terminated; however, the record reflects that he was actually absent May 13, 2013.  See Cason Dep.
at 21; Lamar Dep. at 79, 110-11, 119-20 (stating he did not recall if he was absent but recognizing that
Aikens recorded him as absent in the attendance log and later stating that he missed work because he
had chest pains and/or because he had to take care of his daughter).  With this correction, and including
the point amounts and number of minutes past 4:40 p.m. for each tardy, the dates for which Lamar
received points that counted towards his termination were as follows:

|      |            |                |
|------|------------|----------------|
| (0.5) | 01/17/2013 | tardy (4 min.) |
| (0.5) | 01/25/2013 | tardy (3 min.) |
| (1.0) | 02/04/2013 | absent         |

(continued...)

employment the following day.  See 12-Point Termination; Lamar Dep. at 110.  Pilgrim did

not include the points assessed for Lamar's earlier December 28, 2012, or January 15,

2013, absences in calculating the points he had amassed because he "worked off" those

absences.  See 12-Point Termination.

Pilgrim utilizes a computerized system for tracking attendance called SAP.

See Cason Dep. at 11-12.  The SAP system alerted Cynthia Cason, the HR representative

responsible for assessing attendance policy points for Pilgrim, to Lamar's absences.  See

id. at 6-7, 11.  After recognizing that Lamar had the requisite number of points warranting

discipline, she "had to get with Princess.  She was the FMLA lady.  And she goes over it to

tell me if any of these days is excused, and then we run it, look it up in SAP, to make sure

the information is correct."  Id.  When Cason went over the dates with Williams, Williams

confirmed that none of the dates for which Lamar received points were approved leave days.

---

[6](...continued)

| | | |
|---|---|---|
| (0.5) | 02/06/2013 | tardy (17 min.) |
| (1.0) | 02/08/2013 | absent |
| (1.0) | 02/18/2013 | absent |
| (0.5) | 02/21/2013 | tardy (5 min.) |
| (1.0) | 02/22/2013 | absent |
| (0.5) | 02/25/2013 | tardy (41 min.) |
| (1.0) | 03/01/2013 | absent |
| (1.0) | 03/05/2013 | absent |
| (1.0) | 04/09/2013 | absent |
| (0.5) | 04/17/2013 | tardy (5 min.) |
| (1.0) | 05/06/2013 | absent |
| (1.0) | 05/09/2013 | left early |
| (0.5) | 05/10/2013 | tardy (time sheet showed that he clocked in 4 minutes early) |
| (1.0) | 05/13/2013 | absent |

See 12-Point Termination; Time Sheets at 8-9, 11, 13-15, 20-21, 24-25.  The attendance policy violations listed on the 12-Point Termination total 13.5 points.  Without the disputed absence on March 1, 2013, and the tardy on May 10, 2013, the total points accumulated equals 12.  Although Pilgrim argues that the April 17th tardy was not included in the point total and cites Lamar's deposition, the cited portion is counsel's statement during questioning to support this proposition, which is not evidence.  See Motion at 12 (citing Lamar Dep. at 109).

See id. at 12; see also Williams Dep. at 9.  As such, Cason made the decision to terminate Lamar's employment.  See Cason Dep. at 7, 10.[7]  Cason explained that HR handles terminations, and accordingly she prepared the 12-Point Termination in Lamar's case and sent the document to Lamar's supervisor, Aaron Choice.[8]  See id. at 10-11; Aikens Dep. at 20-21 (explaining that Cason sent the document by email to all debone supervisors and the area manager).  Thereafter, Cason terminated Lamar, presenting him with the 12-Point Termination in a meeting with Choice and Edward Seabrooks, a union steward.  See Cason Dep. at 11-13, 15.  At the termination meeting, Lamar refused to sign the 12-Point Termination form stating that "there were some days on here he had notes for."  Cason Dep. at 12-15; Lamar Dep. at 104.[9]  In response, Cason directed him to bring them in the next day, but she "never heard any more about it."  Cason Dep. at 13-15.

_____

[7]       Lamar argues that no one at Pilgrim would take responsibility for his termination but noted that Cason "came the closest."  Response at 6.  There is no evidence contradicting Cason's deposition testimony, which indicates that she made the determination that Lamar reached twelve points and was subject to termination.  See Cason Dep. at 10.  Aikens also testified that Choice, her peer, notified her of Lamar's termination when he got the documentation from HR.  See Aikens Dep. at 7.  Choice notified Aikens because she had to begin taking the steps to have Lamar replaced.  See id.

[8]       By this time, Choice had replaced Aikens as Lamar's supervisor.  See Aikens Dep. at 7, 9-10.

[9]       Lamar notes that Williams worked as an HR Coordinator for eight years and cites her testimony as stating that she was surprised to learn about Lamar's termination.  See Response at 6.  However, Williams testified that she was surprised because she "wasn't expecting him to be up there, talking about, you know, this happening, termination."  Williams Dep. at 29.  Nothing in Williams' testimony suggests that she thought the fact that Lamar was being terminated was sudden or unexpected.  Similarly, Lamar misconstrues Williams' testimony as to the timing of her discussion with Cason, stating: "Williams testified that she was not consulted or asked to verify the dates on which points were assessed until after the meeting during which Lamar was terminated was already underway."  Response at 11 (citing Williams Dep. at 9).  Instead, Williams testified that she did not know that Lamar's termination was occurring until she heard the termination meeting.  See Williams Dep. at 8-9.  This is because, when Cason called her to verify dates, which occurred prior to the termination meeting based on the testimony from both Williams and Cason, Cason did not mention that she was verifying dates for a 12-point termination.  See id. at 9; Cason Dep. at 11-12.

-11-

Although Lamar appeared to acknowledge that some of the absences from the 6- and 9-Point Warnings were correct at various points in his deposition, he later gave the following testimony:

> Q:    So I want to check just the dates that you specifically have an issue with.
> A:    Well, like I say, actually, I had an issue with, like, pretty much all of them because, like I say, I pretty much worked like them days that I had, you know, six points or whatever, I actually worked them days off, you know. And, like I say, I wouldn't have been there almost three years if I had done actually miss all them days and I was tardy. It wouldn't have been more than a couple of disciplines, never the forms, you know, if I had been tardy all them days or I had been missing all them days, or I had to leave early because it's always firm that they write up on you saying that these - - actually, these events actually took place and happened.
> Q:    All right. So it's your testimony, as you sit here today, that you disagree with every date on Exhibit 9?
> A:    Yes, ma'am.

Lamar Dep. at 105-06; but see Lamar Dep. at 112 ("I agree with you, what's going on, because they've got documentation. But, you know, half of it wasn't - - it wasn't right."). As to the specific absences at issue in this case, relating to his FMLA leave, Lamar testified that he turned in documentation to support the May 6th absence, the May 9th early departure, the May 10th tardy, and the May 13th absence. See Lamar Dep. at 98 ("I turned [the doctor's documentation] into my supervisor, which is Ms. Deborah Akin [sic]."). Lamar initially stated that he had taken his daughter to Little Pine Pediatrics (Little Pine) on those dates but clarified that he also took her to Shands so that either the doctor's office or the hospital should have records regarding those appointments.[10] See id. at 98-99. He further

---

[10]    Pilgrim submits Lamar's response to its requests for production of any documents which support the allegations in his Complaint. See Exhibit 17 to Lamar Dep., Response to Defendant's Request to Produce; Exhibit 14 to Lamar Dep., Response to Requests #5, #6, #7, #8, #9, #10, #11, #12,
                                                                                    (continued...)

explained as to May 9th that he had to leave early because "I actually got a call on my break from my fiancee saying that I had to take off because my daughter wasn't feeling too good," and they took her to the hospital closest to them because they did not have the money to drive her back to Shands."  Id. at 100-01.  Lamar later testified that he did not recall being absent May 13th, the day before he was terminated, but then agreed that the time clock punches would indicate whether he was there or not.  See id. at 110, 115-16.  Moreover, hospital records indicate that Lamar himself went to the hospital on May 13, and he thinks he remembers being sent home from work because he was having chest pains.  See id. at 119-21; Exhibit 14 to Lamar Dep., Emergency Room Bill (Doc. No. 28-3 at 63).  While Lamar does not recall specific dates, he does remember having to take his daughter in for swelling and additional care related to her burn after May 2, 2013.  See Lamar Dep. at 146.

Despite Lamar's recollection neither the medical records from Shands nor Little Pine substantiate any doctor visits for the disputed dates.  In Williams' deposition, she testified that Lamar never indicated to her that his daughter would have continuing care issues nor did he request any additional days off to care for her.  See Williams Dep. at 16, 19-22, 38.  If he needed additional time, Williams further testified, "[h]e should have came [sic] to me and informed me, and I would have gave [sic] him the proper paperwork or whatever was

---

[10](...continued)
#13, #20, and #21.  Within these documents is a fax from Little Pine, where Lamar contends his daughter was seen, which reflects that he accompanied his daughter to appointments on April 30, 2013, June 18, 2013, August 30, 2013, October 24, 2013, and November 21, 2013.  See Exhibit 14 to Lamar Dep. (Doc. No. 28-3 at 46; Little Pine Fax).  However, other than the April 30, 2013 date, the remaining dates followed Lamar's termination.  Additionally, as reflected above, Lamar did not receive any points for April 30, 2013.  See 12-Point Termination.  Lamar did not produce, either in response to requests for production or in opposition to summary judgment, any additional medical records from Little Pine or Shands that substantiate his daughter's doctor's visits during the disputed time period after May 2, 2013.

required that he needed.  I would have gave [sic] it to him." Id. at 21.  Lamar does not

dispute that he dealt exclusively with HR for medical leave. See Lamar Dep. at 91.  Further,

while Lamar testified that he submitted documentation to Aikens of his absences, and that

she "misplaced a majority of [his] paperwork," see id. at 90, he does not cite any record

evidence as to the contents of any missing documents.

## III.    Discussion

"The FMLA grants an eligible employee the right to take up to 12 workweeks of

unpaid leave annually for any one or more of several reasons, including '[b]ecause of a

serious health condition that makes the employee unable to perform the functions of the

position of such employee.'" Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286,

1293 (11th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)) (alteration in Hurlbert).

Additionally, pursuant to 29 U.S.C. § 2612(a)(1)(C), an employee may take FMLA leave "to

care for the spouse, or a son, daughter, or parent of the employee, if such spouse, son,

daughter, or parent has a serious health condition."  In recognition of these rights, the FMLA

further "creates a private right of action to seek equitable relief and money damages against

employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise'

FMLA rights." Hurlbert, 439 F.3d at 1293 (quotation omitted).  The Eleventh Circuit Court

of Appeals has recognized two types of claims arising under the FMLA: "'interference claims,

in which an employee asserts that his employer denied or otherwise interfered with his

substantive rights under the Act, and retaliation claims, in which an employee asserts that

his employer discriminated against him because he engaged in activity protected by the

Act.'" Id. (citation omitted).  Lamar asserts both types of claims in this action.  The Court

turns first to his interference claim.

### A.    Interference

"To prove FMLA interference, an employee must demonstrate that he was denied a

benefit to which he was entitled under the FMLA." Martin v. Brevard Cnty. Pub. Sch., 543

F.3d 1261, 1266-67 (11th Cir. 2008) (per curiam); see also Hurlbert, 439 F.3d at 1293 ("To

establish an interference claim, 'an employee need only demonstrate by a preponderance

of the evidence that he was entitled to the benefit denied.'") (quotation omitted).  Thus, "[a]n

interference claim has two elements: (1) the employee was entitled to a benefit under the

FMLA, and (2) [his] employer denied [him] that benefit." White v. Beltram Edge Tool Supply,

Inc., 789 F.3d 1188, 1191 (11th Cir. 2015) (citing Krutzig v. Pulte Home Corp., 602 F.3d

1231, 1235 (11th Cir. 2010)).  The employee does not have to prove "that his employer

intended to deny the benefit, because 'the employer's motives are irrelevant.'" Krutzig, 602

F.3d at 1235 (quoting Strickland v. Water Works & Sewer Bd. of the City of Birmingham, 239

F.3d 1199, 1208 (11th Cir. 2001)).

In the instant Motion, Pilgrim argues that it did not interfere with Lamar's right to

FMLA leave because it approved his request for leave based on the FMLA Certification, and

he did not seek any additional leave prior to his termination.  See Motion at 15-16.  Pilgrim

further contends that Lamar "simply failed to comply with the attendance policy and was

terminated as a result." Id. at 16.  Lamar responds that Pilgrim prevented him from taking

additional leave on May 6th and 13th by miscalculating his attendance points and

terminating him when he was taking care of his daughter.  See Response at 2, 7-9.  Lamar

also argues that Pilgrim did not follow its own procedures in failing to request that Lamar provide documentation to excuse his absences and giving him five days to comply.  See id. at 8.  In its Reply, Pilgrim states that Lamar "did not present a single document supporting his allegations that he was required to care for his daughter on these dates and there is nothing in the record to support his assertions that he was required to care for his daughter on these dates."  Reply at 2.  As to Pilgrim's attendance policy, Pilgrim explains that the policy dictates that absences and tardies are recorded as they occur, and if Pilgrim requests documentation, then it will give the employee five days to do so.  See id. at 2-3.

Preliminarily, the Court notes the issue before it on Lamar's interference claim is whether Lamar was entitled to and denied FMLA leave after May 2, 2013.  Thus, whether Pilgrim incorrectly assessed points prior to that date, whether on March 1, 2013, or any other day before May 2, 2013, is not material.  Indeed, any such discipline occurred before Lamar even contemplated taking FMLA leave.  Here, Lamar's interference claim is premised upon Pilgrim's failure to grant him FMLA leave on May 6th and 13th and its assessment of two attendance points for those dates which when added to his previously accumulated points resulted in Lamar's termination.  Additionally, although Lamar fails to include May 9th in his argument, the Court also considers whether he was entitled to leave for this date because Lamar testified that he had to leave early on that date to care for his daughter.  Thus, as to his interference claim, the question is whether Lamar was entitled to FMLA leave on May 6, May 9, and May 13 to care for his daughter.

Pilgrim submits the FMLA Certification and additional medical records to establish that Lamar was not entitled to additional FMLA leave after May 2, 2013.  In response, Lamar

argues that he was entitled to FMLA leave because was taking care of his daughter who was experiencing complications.  See Response at 7.  Although Lamar testified that he was taking care of his daughter on at least May 6 and May 9, his actual whereabouts on the days he missed work following May 2, 2013, are not material.  What is material is whether he was entitled to take FMLA leave on those days.

Entitlement to FMLA leave requires that the employee or employee's family member be suffering from a sufficiently serious health condition, see 29 U.S.C. § 2612(a)(1), but that is not all that is required.  Pursuant to 29 C.F.R. § 825.303, an employee must provide the employer with notice of the need for FMLA leave.  See Andrews v. CSX Transp. Inc., 737 F. Supp. 2d 1342, 1350-51 (M.D. Fla. 2010).  Additionally, the FMLA allows the employer to require certification from a health care provider of the employee, or relative, and specifies that the certification must include the date on which the serious condition commenced, the probable duration of the condition, and appropriate medical facts regarding the condition. See 29 U.S.C. § 2613(a)-(b); see also Cooper v. Fulton Cnty., Ga., 458 F.3d 1282, 1285 (11th Cir. 2006) ("Employers may require that employees furnish medical certification to verify eligibility for leave.").[11]  Moreover, "once an employee has applied for leave and it has been granted, the employee is expected to specify each time an absence is related to his FMLA covered leave."  Barnett v. Baycare Health Sys., Inc., No. 8:14-CV-343-T-36TBM, 2015 WL 1737884, at *6 (M.D. Fla. Apr. 16, 2015).  As one district court explained:

---

[11]     The employer must give the employee written notice of the medical certification requirement and the consequences of failing to meet these obligations. Curry v. Neumann, No. 98-8969-CIV, 2000 WL 1763842, at *3 (S.D. Fla. Apr. 3, 2000) (quoting 29 C.F.R. §§ 825.301(a) & (b), 825.305(a)).  The record reflects that Pilgrim gave the requisite written notice in this case.  See FMLA Paperwork.

> [S]uffering from a qualifying serious health condition is not enough to justify
> an employee simply taking leave whenever and for however long []he wishes;
> the FMLA authorizes a medical certification process which, among other
> things, serves to verify employee's claimed health conditions and apprise
> employers of the amount and frequency of leave an employee will likely need.

Graham v. Bluecross Blueshield of Tenn., Inc., No. 1:10-CV-316, 2012 WL 529551, at *5

(E.D. Tenn. Feb. 17, 2012).

To create a question of material fact as to whether Lamar notified Pilgrim of the need

for additional FMLA leave or was entitled to such leave, Lamar cites to his deposition

testimony.  Lamar testified that he gave Aikens documentation for the days he was out;

however, he also testified that the only documentation he had was what he brought in after

he came back to work early, which was April 16, 2013, before his daughter began

experiencing any complications.  See id. at 86-87, 140-41.  Additionally, Lamar's testimony

regarding this documentation fails to provide any information regarding the contents of the

documents he submitted to Aikens.  Moreover, Lamar testified that the pertinent medical

records would be found at either Little Pine or Shands, yet he provided no medical records

from either location to address his daughter's condition on May 6th, 9th, or 13th.  Without

copies of these documents or at least some evidence of their contents, Lamar has failed to

create an issue of fact with regard to whether he was entitled to FMLA leave on the disputed

dates.  Notably, Pilgrim submits records subpoenaed from Little Pine and Shands that

contain no indication that Lamar's daughter was treated on the dates at issue.  See Little

Pine Fax; Work Excuse; Exhibit 12 to Lamar Dep. (Doc. No. 28-3 at 36-37; Shands

Records).  And Lamar produced no contrary evidence.

Further, Lamar does not dispute Williams' testimony that she never received any additional FMLA paperwork as the HR coordinator in charge of such leave.  Indeed, his own testimony reflects that he dealt exclusively with Williams and HR as to medical leave.  See id. at 91; see also Aikens Dep. at 15 ("I don't sign off on FMLA.   That's HR department.").   Lamar points to no evidence that contradicts Williams' testimony that she would have given Lamar additional FMLA paperwork and approved FMLA leave if he had requested it with the appropriate documentation.   Nor does Lamar dispute Cason's testimony that she gave him the opportunity to submit documentation the day after his termination and he never did so.  Instead, the only evidence in the record regarding a request by Lamar for FMLA leave is the FMLA Request with the FMLA Certification reflecting that his daughter had a serious condition for a certain period ending on May 2, 2013, and Pilgrim gave him leave for those specific dates.

Although not binding, the Sixth Circuit Court of Appeals decision in Culpepper v. BlueCross BlueShield of Tenn., Inc., 321 F. App'x 491, 496 (6th Cir. 2009), is instructive with regard to Lamar's interference claim.  In Culpepper, the court affirmed summary judgment in favor of an employer on an FMLA claim, explaining that, even if the plaintiff's condition was serious and she submitted the requisite notice under the FMLA, "her FMLA claim still must fail.  Culpepper received exactly what her doctor ordered–six days of FMLA leave.  No additional leave was authorized by the Certification and Culpepper has not shown that the five absences at issue were taken for one of the reasons enumerated in the FMLA."  Id.  Similarly, Lamar's FMLA Certification stated that his daughter's burn had healed after her last appointment on May 2, 2013, and that she did not require future care.  On this record,

Pilgrim had no reason to anticipate that Lamar would not show up on May 6, 2013, and May 13, 2013, or would have to leave early to take care of his daughter on May 9, 2013, because of complications from her burn.  Regardless of whether Lamar was actually taking care of his daughter on the disputed dates, he has failed to create an issue of fact with regard to his satisfaction of the requirements to qualify him for FMLA leave on those dates.  Indeed, faced with Pilgrim's affirmative evidence and testimony regarding his failure to submit a leave request for any date after May 2, 2013, Lamar points to no medical certification, records or testimony that would support his entitlement to FMLA leave for the dates at issue.

Moreover, although Lamar generally states that he provided "documents," he has pointed to no evidence with regard to the contents of those documents.  To create an issue of fact with regard to his entitlement to FMLA leave, Lamar must present evidence that, on the dates at issue, his daughter was suffering from a condition that qualifies as a "serious health condition" as defined by the FMLA.  See Andrews, 737 F. Supp. 2d at 1352-53. Given the absence of any such evidence in the medical records presented to the Court and Lamar's failure to point to any other evidence with regard to the content of any "documents" he may have given to Aikens, he has failed to create an issue of fact as to his entitlement to FMLA leave on the disputed dates.  On this record, the Court concludes that no reasonable jury could find that Pilgrim interfered with Lamar's right to FMLA leave when it counted his absences on the disputed dates, and Pilgrim is entitled to summary judgment as to this claim.  See Andrews, 737 F. Supp. 2d at 1362.

### B.    Retaliation

Next, the Court turns to Lamar's claim that Pilgrim retaliated against him for taking FMLA leave. "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Strickland, 239 F.3d at 1207. "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" Id. (quoting King v. Preferred Technical Grp., 166 F.3d 887, 891 (7th Cir.1999)). When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, courts apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for Title VII discrimination claims. Strickland, 239 F.3d at 1207.

"A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." Krutzig, 602 F.3d at 1234. "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" Id. (quoting Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000)). Once an employee establishes a prima facie case of retaliation, "the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" Martin, 543 F.3d at 1268 (quoting Hurlbert, 439 F.3d at 1297). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable

factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Id. (quoting Hurlbert, 439 F.3d at 1298).

Pilgrim does not dispute that Lamar engaged in protected conduct by taking FMLA leave from April 12 to 15, 2013, and on May 2, 2013, or that he suffered an adverse employment action because he was terminated.  See Motion at 18.  Instead, Pilgrim contends that Lamar has no evidence to show a causal connection between his FMLA leave and his termination and accordingly cannot present a prima facie case of retaliation.  See id.  In response, Lamar argues the temporal proximity between his request for FMLA leave and his termination is sufficient to establish a causal connection.  See Response at 9-10.  Indeed, "[c]lose temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Hurlbert, 439 F.3d at 1289 (quoting Brungart, 231 F.3d at 799).  While Lamar argues that he was terminated "just one day after taking time off related to his daughter's qualifying condition," see Response at 9-10, as discussed above, Lamar has not established that he was entitled to FMLA leave after May 2, 2013.  Nevertheless, Pilgrim terminated Lamar less than two weeks after his last day of approved FMLA leave.  Accordingly, this temporal proximity is sufficiently close to establish a causal connection between Lamar's termination and his FMLA leave for purposes of establishing a prima facie case of retaliation, and the burden shifts to Pilgrim to provide a legitimate reason for termination.  See Martin, 543 F.3d at 1268.

Pilgrim easily does so by providing record evidence that it terminated Lamar due to poor attendance—that is, Pilgrim terminated Lamar in accordance with its attendance policy

after Lamar accumulated twelve or more points for arriving to work late, leaving early, or missing work entirely. See Motion at 1-2, 18; Response at 10; Cason Dep. at 10; 12-Point Termination. Given this evidence Lamar then must show that this legitimate reason was not the true reason for his termination, but rather is a pretext for retaliation. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). "[T]o avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000). Indeed, so long as the reason proffered by the employer is one that might motivate a reasonable employer, an employee "must meet that reason head on and rebut it." Raspanti v. Four Amigos Travel, Inc., 266 F. App'x 820, 824 (11th Cir. 2008) (quoting Chapman, 229 F.3d at 1030). "It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [the adverse action] was pretextual." Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1278 (11th Cir. 2008) (citing Chapman, 229 F.3d at 1024-25). Thus, the plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted). Nevertheless, the Court does not sit "as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions - indeed the wisdom of them is irrelevant - as long as those decisions

-23-

were not made with a discriminatory motive." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting Chapman, 229 F.3d at 1030).

In evaluating an employee's proof of pretext, the Supreme Court has instructed that "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." See Reeves, 530 U.S. at 147 (emphasis and alteration in original). Nevertheless, disproving an employer's explanation may give rise to a permissible inference that the employer intentionally retaliated against an employee because dishonesty about a material fact may be "affirmative evidence of guilt" or render retaliation the most likely alternative explanation for the employer's action. See id.; see also Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1293 (D.C. Cir. 1998) ("If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination."). On the other hand, an employer would be entitled to summary judgment "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred."[12] Reeves, 530 U.S. at 148 (citing Aka, 156 F.3d at 1291-92).

Preliminarily, the Court notes that while close temporal proximity "is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection,'" it is "probably insufficient to establish pretext by itself." Hurlbert, 439 F.3d at

---

[12]     Although the Reeves decision analyzed the denial of an employer's motion for judgment as a matter of law under Rule 50, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law such that 'the inquiry under each is the same.'" Reeves, 530 U.S. at 150 (quoting Anderson, 477 U.S. at 250-51).

1298 (quotations omitted); <u>see also</u> <u>Daugherty v. Mikart, Inc.</u>, 205 F. App'x 826, 827 (11th Cir. 2006) ("The passage of a short amount of time between the plaintiff's request for leave and his termination may not be sufficient, by itself, to establish pretext."). Here, the Court finds that temporal proximity is insufficient to create a question of fact as to pretext. Indeed, the undisputed record evidence shows that the timing of the decision to terminate Lamar was based on his accumulation of at least twelve points, not the fact that he took FMLA leave prior to reaching that point. As evidence of pretext, Lamar cites Pilgrim's failure to follow its own policy for assessing points, the decreasing time between points assessed and progressive discipline, "the miscalculation and improper assessment of points," and his own testimony that he submitted "'doctor notes' for the May 2013 occurrences." Response at 10-13. Upon review of the record, the Court finds that these additional arguments as to evidence establishing pretext are not supported by the evidence.

While "an employer's deviation from its own standard procedures may serve as evidence of pretext," <u>Hurlbert</u>, 439 F.3d at 1299, Lamar has not demonstrated such a deviation. He argues that Pilgrim deviated from its attendance policies because it did not allow Lamar five days to provide documentation to excuse his absences prior to his termination. However, nothing in Pilgrim's attendance policy requires it to give an employee who has reached twelve points an additional five days to produce documentation and Lamar has not submitted any evidence to suggest that Pilgrim had an unwritten practice of doing so. Instead, the policy states that, when requested to do so, an employee has five days to provide documentation or that employee will be charged an absence. <u>See</u> Pilgrim Employee Handbook at 15. Under Pilgrim's attendance policy, the employee can review their

attendance record upon request, but HR employees record employee absences and tardies as they occur.  See id. at 14.

Lamar also argues that the time between the accrual of the points and the warning got shorter, from his 6-Point Warning, which Aikens gave him nearly two weeks after the accrual of his last alleged infraction, to his 9-Point Warning, which Aikens gave him a week after the last alleged occurrence, and ultimately the 12-Point Termination, just one day after the last absence.  See Response at 4.  While Pilgrim's policy provides that an employee will be given six and nine point warnings, the policy does not state that the warnings must be given within a certain time after the employee accumulates the requisite number of points.  See Pilgrim Employee Handbook at 14-15.  The Court can infer nothing sinister about the timing of the discipline, not only because the policy does not dictate a time frame, but also because the shorter time frame for the 9-Point Warning is consistent with the stated purpose of the attendance policy and the warnings themselves:  "Employees have the right to know the status of their attendance records in order to monitor and plan so as to not unknowingly jeopardize employment when a decision to miss or not miss work is made."  Id. at 14.  After receiving the 9-Point Warning, and before taking FMLA leave, Lamar knew that he was close to termination, and, after taking FMLA leave, he also knew that he was required to submit documentation to Williams to support his absences.  Although the Court accepts Lamar's testimony that he provided some doctor's notes, as discussed above, there is no evidence that the documentation provided was sufficient to establish entitlement to FMLA leave and excuse his absences following May 2nd.  Further, even though Cason made the decision to terminate Lamar, the undisputed evidence is that she told Lamar she would

consider any additional documentation to support additional leave for those absences, which appears to be consistent with Pilgrim's attendance policy, if not an exception to it in Lamar's favor. See Cason Dep. at 12-15. At no time has Lamar suggested that he ever attempted to provide such documentation. Finally, the Court notes that Lamar presents no evidence that Pilgrim treated any other employees differently in assessing points, issuing warnings, or terminating the employment of those who reach twelve points in a comparable time frame. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 835 (8th Cir. 2002) (granting summary judgment finding that, where an employee failed to point to other employees who were treated differently under the progressive discipline policy, the failure to give a written warning did not tend to prove that the reason given for her firing was pretextual, and evidence of pretext was otherwise insufficient).

Lamar also argues that Pilgrim failed to follow its own policies as to his termination because Cason did not check with Williams to verify dates until after the meeting to terminate him was underway. However, a review of Cason's testimony reveals that she did follow the procedure for termination by checking with her supervisor, forwarding the termination sheet to Lamar's supervisor, and verifying dates with Williams. See Cason Dep. at 10-14 ("Q: After meeting with Ms. Williams to go over the dates at issue, did you then proceed with the termination? A: Yes."). Cason testified that she then had a meeting with Lamar, his supervisor, Choice, and a union representative, pursuant to the attendance policy. See Pilgrim Employee Handbook at 14-15; Cason Dep. at 11-13, 15. Although Lamar suggests that it was "inexplicable" that Cason came to the conclusion that he had reached the amount of points necessary to terminate employment, Cason readily explained

that the SAP system alerts her to individuals who have reached twelve points, based on the assessment of their direct supervisors responsible for keeping track of attendance like Aikens and Choice.  Therefore, Lamar points to no evidence showing an inconsistent application of Pilgrim's attendance policy to suggest pretext.

To the extent that Lamar points to the calculation of his attendance points as evidence of pretext, it is significant that Lamar had documented attendance issues before taking FMLA leave.  Indeed, he had already received the 9-Point Warning before submitting his FMLA Request.  "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."  Smith, 302 F.3d at 834; see also Barron v. Sch. Bd. of Hillsborough Cnty., 3 F. Supp. 3d 1323, 1334 (M.D. Fla. 2014).  Lamar had been counseled for untimeliness as early as December 12, 2012.  See Exhibit 5 to Lamar Dep., Progressive Discipline Form ("Verbal Warning, farther [sic] will taken if this reoccur such as warning, suspension and[/]or[] discharge.").  Lamar points to two discrepancies on his Time Sheets to show that he had not yet actually reached twelve points to be subject to termination. Indeed, there are two disputed dates, March 1, 2013, when he was either absent or not scheduled to work, and May 10, 2013, when he was recorded tardy but clocked in four minutes early.  See Response at 7-8.  Without these two dates, which add up to one and a half points, Lamar still had twelve points to subject him to termination.  Lamar argues that he should not have been counted tardy on April 17, 2013, because he was still on FMLA leave.  See id.  However, he returned to work on April 16, 2013, although he could have had that day off to care for his daughter.  Morever, he points to nothing in the record to suggest

that the tardy on April 17th was from taking care of his daughter that morning.  Indeed, Lamar himself did not even testify that he was caring for his daughter on the morning of the 17th.

More importantly, even if Lamar did not actually have twelve points, Lamar has not created a question of fact as to whether Cason believed that he did, and thus, whether she terminated him for having been late or missing work enough times to be subject to termination.  "[T]ermination based on even a mistaken, but honestly held, belief concerning leave time is still termination based on a reason unrelated to the FMLA."  Phillips v. Mathews, 547 F.3d 905, 911 (8th Cir. 2008).  Indeed, the Eleventh Circuit has explained that "an employer may fire an employee based upon erroneous facts, as long as it is not for a discriminatory reason." Daugherty, 205 F. App'x at 827.  To the extent that Lamar suggests, from his deposition testimony, that every absence or tardy was concocted to support terminating him, such a theory is not supported by the evidence, particularly since he accumulated a majority of his points prior to taking FMLA leave.  He also does not dispute missing work on May 6th or 13th or leaving early on May 9th because those dates are the basis for his FMLA interference claim.  At best, Lamar has shown that Pilgrim may have erred in assessing points on March 1, 2013, and May 10, 2013, which does not establish pretext.

Last, Lamar suggests that, while there is substantial evidence of pretext beyond his own testimony, such testimony is itself sufficient to withstand a motion for summary judgment. see Response at 12-13.  The problem with Lamar's argument is that he relies on the testimony that he submitted doctor's notes and his contention that he "was never even

given the chance to submit anything before he was terminated." Id. at 13.  Initially, the Court notes that these two statements are contradictory, and the latter is contrary to the record. Lamar had a chance to submit documentation and submitted only the FMLA Certification. More importantly neither statement suggests that Lamar was terminated in retaliation for taking FMLA leave.

Based on Lamar's testimony, this record is not without some factual disputes, such as whether Lamar had to wait in long lines to clock in and accordingly was marked tardy when he was physically on Pilgrim's property by the beginning of his shift.  However, Lamar has not created a question of material fact as to whether Pilgrim terminated him for any reason other than his failure to comply with the attendance policy.  Nothing in Lamar's deposition or elsewhere in the record suggests that Pilgrim harbored any sort of discriminatory or retaliatory animus towards Lamar because he took FMLA leave.[13] Accordingly, Lamar has failed to meet his burden to create an issue of material fact as to

---

[13]     Lamar suggests in his deposition testimony that Pilgrim did not make the same documentation demands of other employees based on what he overheard when he was in the HR office, stating:

> That's why I feel like it wasn't right for them to terminate me when I done sat up there and listened and heard other, you know, conversations and people asking them for medical leaves and, you know, personal leave.  And they just automatically give it to them without asking them for paperwork before and after.  But I had to bring paperwork before everything went on.

Lamar Dep. at 139.  He does not cite to this hearsay testimony in his response as evidence of pretext and, even if it could be considered, it would suggest that Pilgrim liberally grants FMLA and other leave but gave Lamar a hard time for some reason other than the fact that he wanted to take FMLA leave.  It does not tend to suggest that Pilgrim retaliated against Lamar for taking approved FMLA leave.

      Additionally, Lamar testified that Aikens had an "attitude" towards him when she gave him his 6-Point Warning.  While Lamar does not explain the basis for this hostility, it occurred prior to his request for FMLA leave and Aikens was not the person who decided to terminate him.  This evidence does not create any inference that the unexcused absences and tardies were not the reason for termination or that taking FMLA leave was the real reason.

whether Lamar's termination for excessive absences was a pretext for retaliation, and Pilgrim is entitled to summary judgment as to his retaliation claim as well as his interference claim.

In light of the foregoing it is hereby **ORDERED**:

1.     Defendant's Motion for Summary Judgment and Memorandum of Law (Doc. No. 28) is **GRANTED**.

2.     The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Pilgrim's Pride Corporation and against Plaintiff Auntra Lamar.

3.     The Clerk is further directed to terminate any pending motions and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 14th day of September, 2015.

**MARCIA MORALES HOWARD**
United States District Judge

lc16

Copies to:

Counsel of Record

-31-